**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **ALFONZO GILLIS et al.,** | * | |
| **Plaintiff,** | * | |
| v. | | **Case No.: GJH-18-3923** |
| | * | |
| **HOUSEHOLD FINANCE** | | |
| **CORPORATION III et al.,** | * | |
| | * | |
| **Defendants.** | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Alfonzo and Sandra Gillis brought this civil action alleging that Defendants improperly managed Plaintiffs' mortgage loan over several years including by imposing and collecting invalid loan charges and failing to respond to or conduct reasonable investigations related to Plaintiffs' written inquiries. Pending before the Court are Defendants Caliber Home Loans, Inc. (Caliber), Household Finance Corporation III (Household Finance), and Select Portfolio Servicing, Inc. (SPS)'s Motions to Dismiss. ECF Nos. 15, 16, & 17. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Defendants' Motions to Dismiss will be granted in part and denied in part.

## I.     BACKGROUND[1]

Plaintiffs are owners of 9729 Green Apple Turn, Upper Marlboro, MD 20772 (the Property). ECF No. 1-2 ¶ 8. They have resided in the Property since March 11, 1988 and continue to reside there. *Id.* ¶ 17. In March 2007, Plaintiffs refinanced their home mortgage loan,

---

[1] Unless otherwise stated, these background facts are taken from Plaintiff's Complaint, ECF No. 1-2, and are presumed to be true.

which at the time was serviced by Defendant Household Finance. *Id.* ¶ 18. At the time of the refinance and continuing thereafter, Plaintiffs paid their property taxes and homeowners' insurance separately from their mortgage loan except for the taxes and insurance owed in 2014, which Household Finance paid on Plaintiffs' behalf, but which Plaintiffs repaid to Household Finance. *Id.* ¶ 19.

In 2010, Mr. Gillis experienced congestive heart failure, which forced him to retire early. *Id.* ¶ 20. Early retirement reduced Plaintiffs' income by 60%, and they began to struggle to make their loan payments. *Id.* To mitigate their situation, Plaintiffs made several attempts to modify their mortgage. *Id.* ¶¶ 20–21. Despite Plaintiffs efforts, Household Finance offered only short-term forbearance plans, which temporarily alleviated Plaintiffs' financial pressures. *Id.*

Plaintiffs' long-term economic stress continued, and in December 2014, Mrs. Gillis again spoke to an Household Finance representative about obtaining a loan modification. *Id.* ¶ 22. On March 13, 2015, Plaintiffs learned that they had apparently been approved for a loan modification, but a Household Finance representative informed Plaintiffs that to accept the modification they needed to pay a sum of $976.26 as well as a $15 processing fee. *Id.* Mrs. Gillis responded that she would contact the representative in a few days once she had discussed the agreement with her husband. *Id.*

On March 17, 2015, Plaintiffs attempted to call the Household Finance representative to accept the modification and to make the first payment. *Id.* ¶ 23. However, the representative did not answer and did not return any messages left by the Plaintiffs that day or over the next several days. *Id.* Despite not receiving any written confirmation from Plaintiffs, Household Finance drafted $991.26 from Plaintiffs' bank account on March 20, 2015. *Id.*

Plaintiffs eventually contacted a different Household Finance representative on March 24, 2015. *Id.* ¶ 24. The representative told them that there were "no notes in the system" regarding their prior conversations or the modification. *Id.* Later that day, the original Household Finance representative told Plaintiffs that she had made an error, that Plaintiffs were not approved for a modification after all, and that their "modification payment" would be applied to their account. *Id.* The representative suggested that Plaintiffs restart the process of applying for a modification. *Id.* Plaintiffs did so, submitting a new modification application two days later. *Id.* ¶ 26.

Between April 21, 2015 and April 23, 2015, Plaintiffs received conflicting letters from Household Finance. *Id.* ¶ 27. One letter was a written denial of their loss mitigation application while another acknowledged a "repayment agreement and loss mitigation." *Id.* ¶ 27. Plaintiffs relied on the repayment plan by making all the required payments, including a $1,676.56 payment on April 24, 2015, a $2,668 payment on May 11, 2015, and a $2,960.34 payment on June 8, 2015. *Id.*

Plaintiffs also contacted a Household Finance representative to seek clarification on the proposed repayment plan. *Id.* ¶ 28. The representative described to Plaintiffs how Household Finance anticipated applying the repayments and indicated that a portion of the purported past due balance in the amount of $3,656.49 on Plaintiffs' loan consisted of "uncollected fees." *Id.* ¶ 28. When Plaintiffs asked what these fees consisted of, the representative initially said they were arrearage tax payments fronted by Household Finance. However, after Plaintiffs explained that they had paid the Property's taxes, the representative indicated that the "uncollected fees" were past due late charges, which had accrued prior to the Plaintiffs' 2007 refinance. Yet Plaintiffs' pre-2007 loan had been fully paid and discharged in the refinance. *Id.* ¶ 29 (citing the land

records for Prince George's County at Book 27974, Page 459). Plaintiffs therefore contacted

Household Finance to verify that the representations regarding the purported "uncollected fees"

were accurate. *Id.* ¶ 29. On May 18, 2015, an authorized Household Finance representative, the

manager of customer disputes, responded to Plaintiffs by confirming what they had previously

learned with the following:

> You established this mortgage with Household Finance on March 19, 2007. We
> have enclosed a copy of the Loan Repayment and Security Agreement for your
> review. We have confirmed that you were not informed that the current fee
> balances were on record when Household Finance acquired the loan. Please be
> advised that there are two types of fee balances on the account. The first is for late
> fees, which has a current balance of $3,611.50. The second is for corporate
> advances, which represents funds Household Finance has advanced your behalf
> for delinquent property taxes, which has a current balance of $6,892.67.

*Id.*

Plaintiffs understood this response to be an admission by Household Finance that the

purported late fees were from their pre-2007-refiance loan, that Plaintiffs had not been informed

that these costs would be added to the refinanced loan, and that Household Finance would fix its

admitted error. *Id.* ¶ 31. Plaintiffs continued to make payments on their loan and repayment plan

and confirmed that their account was paid and current through September 2015. *Id.* Plaintiffs

continued making their timely payments for each month thereafter, believing that these payments

were being applied to their loan principal. *Id.* ¶¶ 31, 34.

On November 19, 2015, Household Finance notified Plaintiffs that it intended to transfer

their loan servicing to Defendant Caliber effective December 8, 2015. *Id.* ¶ 32. Having finally

succeeded in bringing their loan up to date, Plaintiffs contacted Caliber immediately upon

receiving this notice to make sure that they understood where to make their payments and to

ensure a smooth transition. *Id.* Although Plaintiffs believed that any uncollected-fee issues

leftover from before their 2007 refinance had been resolved by Household Finance, Household

Finance represented to Caliber that at the time of the servicing transfer, Plaintiffs had an "uncollected late charge" in the amount of $3,656.49. *Id.* ¶ 33. Therefore, unbeknownst to Plaintiffs, the loan continued to be inappropriately infected by sums from a prior loan even though that loan had been completely satisfied more than three years prior. *Id.*

After the servicing transfer to Caliber, Plaintiffs continued to make timely payments. *Id.* ¶ 35. However, they noticed that Caliber was applying portions of their payments to purported uncollected late charges. *Id.* To seek clarification, Mrs. Gillis contacted Caliber on April 7, 2016 and spoke with an authorized representative to (i) learn why Caliber was assessing a fee its predecessor had admitted it had no right to collect; and (ii) to obtain a payment history. Caliber's authorized representative was unable to answer Mrs. Gillis's questions, and only responded by stating that Household Finance had modified the loan on May 17, 2010 even though Household Finance had not modified Plaintiffs' loan in 2010. *Id.* ¶ 36. Mrs. Gillis requested that Caliber send her a copy of the purported modification agreement and an accounting of her payment history; however, Caliber never sent her either document. *Id.*

On November 9, 2016, Caliber informed Plaintiffs that it would be transferring the loan servicing to Defendant SPS effective December 1, 2016. *Id.* Caliber relayed to SPS that Plaintiffs owed $2,892.51 in "uncollected late charges." *Id.* Caliber also told SPS that it had expended $4,884.79 in lender-paid advances even though Plaintiffs did not have an escrow account set up with Caliber and had instead paid their property taxes and insurance separate from their mortgage. *Id.* In light of these representations, SPS believed the loan to be in default at the time the servicing transferred to it from Caliber. *Id.*

On December 27, 2016, Plaintiffs received their first monthly statement from SPS. *Id.* ¶ 41. Plaintiffs learned SPS was continuing to charge the fees associated with the pre-2007

loan. *Id.* Further, SPS had added $27,362.37 to the Plaintiffs' loan, which it labeled "deferred principal." *Id.* None of Plaintiffs' statements from Caliber or Household Finance indicated that there were any deferred sums owed on the loan, so Mrs. Gillis contacted SPS on December 27, 2016 to clarify the monthly statement and was told that SPS would research the matter and send her a response. *Id.* After not receiving a response, Mrs. Gillis followed up with SPS for a complete accounting of the loan; however, on March 6, 2017, SPS responded that it was "unable to fulfill" Plaintiffs "inquiry for documentation." *Id.*

Mrs. Gillis contacted SPS several more times for clarification regarding what SPS claimed Plaintiffs owed, and why it arrived at that conclusion. *Id.* at 43. On January 13, 2017, Mrs. Gillis spoke with Jeannie Ford who represented that $27,000 had been added to the loan in 2010 as "deferred principal resulting from a modification" even though Plaintiffs had not received a modification. *Id.* On January 21, 2017, Mrs. Gillis spoke with Kevin who could not provide Plaintiffs with an explanation for the fees being charged by SPS and informed Plaintiffs that there was a 16-day grace period for them to make payments on the loan. *Id.*

On February 9, 2017, SPS sent Plaintiffs a notice of interest rate change for the upcoming year. *Id.* ¶ 45. The notice indicated that the interest rate would remain the same, and, as had been the case with prior servicers, there would not be any escrowed funds for taxes or insurance. *Id.* Plaintiffs therefore continued to pay the property taxes and homeowners' insurance owed on the loan separately from the mortgage. *Id.* But on April 28, 2017, SPS sent Plaintiffs a notice of delinquent property taxes. *Id.* ¶ 46. Fearful that their home could be auctioned at a tax sale without their knowledge, Plaintiffs relied upon SPS's representations and immediately contacted the Prince George's County Office of Finance to determine their status; no tax payment was due because Plaintiffs had already paid the tax assessment, and there were no past-due or delinquent

taxes owed on their account. *Id.* ¶ 47. Plaintiffs further inquired from the Office of Finance whether the prior servicer, Caliber, had ever made a payment towards the property taxes and were informed that it had not. *Id.* In further reliance upon SPS's representations, on May 5, 2017, Plaintiffs contacted SPS to clarify that no tax payment was due. *Id.* ¶ 48.

On May 3, 2017, SPS sent another notice to Plaintiffs informing them that it intended to begin collecting escrow for taxes and insurance on the Property even though Plaintiffs were paying for taxes and insurance separate from their mortgage and were current on these payments. *Id.* SPS also wrote that Plaintiffs' loan had a negative escrow advance balance of $4,733.82 from prior servicers, which it intended to collect. *Id.* Confused by this accounting and not wanting to pay sums not owed, Plaintiffs contacted SPS on May 8, 2017 to request an itemization of how and when the $4,733.82 had purportedly accrued. *Id.* ¶ 50. SPS's authorized representative told Plaintiffs that Caliber had submitted that sum to the Prince George's County Treasurer. *Id.* In light of her prior conversation with the Finance Office, Mrs. Gillis further requested to know the date that purported payment had been made, but SPS's representative responded that she was "unable to disclose that information" and that she could not find any records related to the payment. *Id.* Mrs. Gillis requested that SPS research and send her a copy of the purported payment. *Id.*

On June 2, 2017, SPS sent Plaintiffs a letter informing them that it needed an additional 30–45 days to complete its research into her request. *Id.* ¶ 51. Days earlier though, on May 30, 2017, SPS had sent Plaintiffs a second notice of delinquent property taxes. *Id.* ¶ 52. In reliance on this correspondence, on June 5, 2017, Mrs. Gillis called SPS and verified once again to an SPS representative that the property taxes were current. *Id.* ¶ 53. The representative acknowledged that the March 31, 2017 property tax payment was verified and told Mrs. Gillis

that she did not need to take any further actions. *Id.* Since she had not heard any further from SPS regarding her research request, Mrs. Gillis further inquired about the purported $4,733.82 negative escrow balance. *Id.* The representative responded that the sum might be related to property insurance rather than taxes, and that she should speak to the insurance department. *Id.* Mrs. Gillis called SPS's insurance department that same day and a representative informed her that there were no issues regarding Plaintiffs' insurance policy. *Id.* ¶ 54. She was transferred to a service representative who informed her that SPS was still researching the purported negative escrow balance, and that Plaintiffs should pay the higher monthly payment while SPS continued to research. *Id.*

Frustrated that SPS continued to ignore her inquiries while simultaneously adding unexplained fees and charges to her mortgage account, Mrs. Gillis wrote to SPS on June 5, 2017, using the address designated for qualified written requests (QWRs) reiterating what she had explained to SPS's representatives on multiple occasions: (i) that Plaintiffs' loan had never included an escrow account; (ii) that the property taxes and homeowners' insurance were current; (iii) that her loan had not been modified in 2010; and (iv) she did not owe an escrow balance or late fees. *Id.* ¶ 55. Mrs. Gillis sent a copy of the SPS QWR to the Consumer Financial Protection Bureau on June 26, 2017, and Plaintiffs filed a complaint with the CFPB against Caliber on the same date. *Id.* ¶ 56.

On June 21, 2017, SPS sent Plaintiffs a notice that it intended to impose retroactive insurance on the Property from May 2, 2017 through May 30, 2017 and requested that Plaintiffs sign and return a document to establish an escrow account going forward. *Id.* ¶ 57. Plaintiffs elected not to entrust SPS with even more funds, instead deciding they would continue to pay their taxes and insurance separately. *Id.*

On July 5, 2017, SPS responded to Plaintiffs' inquiries regarding their account by claiming Caliber believed that Household Finance had paid property taxes in 2013, 2014, and part of 2015, that Plaintiffs owed a late fee balance of $2,892.51 at the time the servicing transferred to SPS, and that SPS determined that this balance was valid. *Id.* ¶ 58. SPS further included an inaccurate transaction history from Caliber, which included purported loan transactions dating back to 2007, before Caliber had begun servicing the loan. *Id.* The transaction history included a purported payoff statement concerning the amount needed to satisfy the loan as well as a purported escrow disbursement history, which contained just one transaction. *Id.* Despite Plaintiffs' prior communications with SPS regarding inaccuracies, the payoff statement included the "deferred interest" that SPS had added when it began servicing Plaintiffs' loan as well as the unexplained negative escrow balance. *Id.* The payoff statement also included interest on the purposed escrow advances even though Plaintiffs had explained several times that they had no escrow account associated with their loan. *Id.* The payoff statement also claimed that Plaintiffs owed $2,711 in "late charges outstanding"—the fees purportedly associated with the pre-2007 loan. *Id.*

Given the deficiencies in SPS's response, Plaintiffs sent another letter to SPS on July 19, 2017 at the address designated for QWRs. *Id.* ¶ 62. Plaintiffs requested that SPS provide them with (i) all documents received from Caliber (ii) all documents related to the purchase and owner of their loan; (iii) any documents related to any loss mitigation application or decision; (iv) all audio recordings made related to the loan; and (v) a complete account of the loan, including a complete accounting of the escrow account. *Id.* On July 28, 2017, SPS partially responded to Plaintiffs' request by sending them another payoff statement. *Id.* ¶ 66. The payoff statement included the same inaccurate details that SPS had previously provided. *Id.*

On August 16, 2017, SPS further responded by providing Plaintiffs with the date of the servicing transfer and the name of the loan's owner. *Id.* ¶ 67. SPS also informed Plaintiffs that the purported escrow deficiency was because although their account was not escrowed, SPS was collecting for an escrow advance balance transferred from Caliber for tax advances made by the prior servicer. *Id.* SPS also included a printout of Plaintiffs' servicing history, which indicated that as of August 16, 2017, SPS had collected $55 in eight separate EZ-Pay fees between December 27, 2016 and July 31, 2017 for its acceptance of Plaintiffs' partial prepayment of their loan. *Id.*

Plaintiffs wrote again to SPS to request clarification. *Id.* ¶ 70. Because SPS's representatives had informed Plaintiffs that their loan had been modified, when to Plaintiffs' knowledge it had not been, Plaintiffs requested a copy of the purported modification documents. *Id.* SPS responded to Plaintiffs' third QWR by insisting that the charges it claimed due were valid. *Id.* ¶ 71. SPS sent Plaintiffs another payoff statement claiming that the disputed escrow funds were due, and that Plaintiffs further owed "late charges outstanding"—the fees Household Finance had previously admitted were an error. *Id.* SPS admitted that the loan had not been modified in 2010, but claimed that the $27,364.37, which had been added to the loan, consisted of "uncollected interest" as follows:

| | |
|---|---|
| December 29, 2008 | $4,372.58 |
| June 10, 2010 | $5,604.51 |
| September 14, 2011 | $5,938.08 |
| November 26, 2012 | $3,900.05 |
| December 30, 2013 | $3,837.54 |
| September 29, 2015 | $3,711.64 |
| **Total** | $27,364.37 |

*Id.* ¶ 71.

On November 6, 2017, SPS sent Plaintiffs a notice that it would no longer be collecting the escrow sums it had unilaterally started collecting in June 2017. However, even though Plaintiffs had continued to pay their taxes and insurance while SPS was unnecessarily collecting escrow sums, SPS did not return any of these sums to Plaintiffs or inform them of how it had applied the sums collected by SPS to the Plaintiffs' loan. *Id.* ¶ 72. On October 12, 2018, SPS again sent Plaintiffs a payoff statement that included the same inaccuracies regarding Plaintiffs' owing an escrow advance balance, interest on the purported negative escrow balance, and outstanding late charges. *Id.* ¶ 73.

While Plaintiffs sought clarification from SPS, it also continued to pursue information from Caliber. *Id.* ¶ 63, Because Plaintiffs had heard nothing from Caliber in response to their complaint to the CFPB, they sent it a letter on July 19, 2017, using the address designated by Caliber to receive QWRs. *Id.* Plaintiffs requested that Caliber provide them with (i) all documents relating to any loss mitigation application or decision on those applications; (ii) all mortgage statements made by Caliber; (iii) copies of all payments made on Plaintiffs' account; (iv) copies of all audio recordings made related to Plaintiffs' loan; (v) all documents sent to SPS regarding the status of Plaintiffs' loan when it was transferred; (vi) all documentation related to any property tax purportedly paid by Caliber to the Prince George's County Treasurer related to the property; and (vii) an accounting of all purported expenditures made by Caliber from escrow. *Id.* Caliber responded on July 28, 2017 with Plaintiffs' six most recent months of billing statements and a complete payment history, which it claimed showed how Plaintiffs' payments had been applied to the loan's principal, interest, property tax and insurance, and corporate advances. *Id.* ¶ 64. Caliber stated that it had "determined any unanswered questions to be

overbroad and/or unduly burdensome" and that "as such, the information [would] not be provided." *Id.* ¶ 64.

Over the years that Plaintiffs have spent trying to understand the inaccurate fees charged to their loan account, they sustained losses including postage expenses to send written inquiries and notices of errors and lost time from work. *Id.* ¶ 76. They have also sustained emotional damages and losses manifested by frustration, anger, fear, sleeplessness, and exacerbated medical conditions including headaches and high blood pressure. *Id.*

On October 19, 2018, Plaintiffs filed suit in the Circuit Court of Montgomery County alleging that Defendants violated Maryland's Consumer Debt Collection Practices Act (MCDCA), Com. Law, § 14-201, *et seq.*, Maryland's Consumer Protection Act (MCPA), Md. Code Ann., Com. Law, § 13-101, *et seq.*, and Maryland's Mortgage Fraud Protection Act (MMFPA), Md. Code Ann., Real Prop. § 7-401, *et. seq.* ECF No. 1-2 at 27, 28, 31. Plaintiffs also alleged that Caliber and SPS violated the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605, and its implementing regulations, 12 C.F.R.§ 1024.36, and 12 C.F.R.§ 1024.35. ECF No. 1-2 at 34. Finally, Plaintiffs alleged that SPS violated Maryland's usury law, Md. Code Ann., Com. Law § 12-114, by charging Plaintiffs EZ-Pay fees.[2] ECF No. 1-2 at 32.

## II. STANDARD OF REVIEW

Defendants move to dismiss Plaintiffs' Complaint on the ground that it fails to state a claim upon which relief can be granted. When deciding a motion to dismiss for failure to state a claim, a court "must accept as true all of the factual allegations contained in the complaint," and "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v.*

---

[2] Although Plaintiffs' Complaint also included a claim for declaratory relief against SPS, Plaintiffs have since conceded that such relief is not an independently cognizable cause of action under federal law and may be dismissed.

*Kolon Indus., Inc.*, 637 F.3d 435. 440 (4th Cir. 2011) (citations and internal quotation marks omitted). Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But to survive a motion to dismiss invoking Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662. 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544. 570 (2007)). The factual allegations must be more than "labels and conclusion . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A complaint will not survive Rule 12(b)(6) review where it contains "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *See id.* at 679 (citing Fed. Rule Civ. Proc. 8(a)(2)).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, plaintiffs "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir.2008) (internal quotation marks and citation omitted). "These facts are often referred to as the 'who, what, when, where, and how' of the alleged fraud." *Id.*

## III.    DISCUSSION

### A.  Maryland Consumer Debt Collection Act (MCDCA)

Defendants each move to dismiss Plaintiffs' MCDCA claims, which are alleged in Count I. Pursuant to the MCDCA, a debt collector may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Md. Code, Com. Law § 14-202(8). To state violation of this provision, a plaintiff "must set forth factual allegations tending to establish two elements: (1) that Defendants did not possess the right to collect the amount of debt sought; and (2) that Defendants attempted to collect the debt knowing that they lacked the right to do so." *Amenu-El v. Select Portfolio Servs.*, No. CV RDB-17-2008, 2017 WL 4404428, at *4 (D. Md. Oct. 4, 2017) (internal quotation marks and citations omitted). A debt may be "invalid if a debt collector seeks to collect an amount that exceeded the amount owed 'as a result of the debt collector's inclusion of an unauthorized charge.'" *Barr v. Flagstar Bank, FSB*, 303 F. Supp. 3d 400, 420 (D. Md. 2018) (quoting *Conteh v. Shamrock Cmty. Ass'n, Inc.*, 648 Fed. Appx. 377, 381 (4th Cir. 2016)).

#### i.    Defendant Household Finance

Plaintiffs have sufficiently alleged an MCDCA claim against Defendant Household Finance. In April 2015, Plaintiffs received a letter from Household Finance acknowledging their eligibility for a repayment plan as part of loss mitigation efforts. ECF No. 1-2 ¶ 27. They relied on the repayment plan by making required payments, and they spoke to an Household Finance representative to seek clarification about how their payments were being applied to their loan. *Id.* ¶ 28. The Household Finance representative told Plaintiffs that their payments were being applied in part to a past due balance of $3,656.49 in "uncollected fees." *Id.* According to the

representative, these fees had accrued prior to the Plaintiffs' 2007 refinance of their loan. But their pre-2007 loan had been fully paid and discharged in the refinance. *Id.* ¶ 29 (citing the land records for Prince George's County at Book 27974, Page 459). In this context, Plaintiffs contacted Household Finance to explain that the fees associated with their prior loan, which had been fully discharged, could not possibly be authorized charges on their current loan. *Id.* A Household Finance representative responded to Plaintiffs' complaint with a letter explaining:

> You established this mortgage with Household Finance on March 19, 2007. We have enclosed a copy of the Loan Repayment and Security Agreement for your review. We have confirmed that you were not informed that the current fee balances were on record when Household Finance acquired the loan. Please be advised that there are two types of fee balances on the account. The first is for late fees, which has a current balance of $3,611.50. The second is for corporate advances, which represents funds Household Finance has advanced your behalf for delinquent property taxes, which has a current balance of $6,892.67.

*Id.*

Plaintiffs understood this response to be an admission by Household Finance that the purported late fees were related to the loan that had been discharged in their 2007 refinance, that Plaintiffs had not been informed that these costs would be added to the refinanced loan, and that Household Finance would fix its admitted error. *Id.* ¶ 31. Assuming that Household Finance would resolve the erroneous charges, Plaintiffs continued to make payments on their loan and repayment plan. *Id.* They believed their timely payments were being applied to their loan principal and to authorized charges only. *Id.* ¶¶ 31, 34. However, after the loan's servicing was transferred to Defendant Caliber, Plaintiffs learned in December 2015 that Household Finance had continued to divert portions of Plaintiffs' payments to unauthorized charges associated with their fully discharged 2007 loan. *Id.* ¶ 33.

Accepting Plaintiffs' allegations as true at this stage, Defendant Household Finance did not possess the right to collect portions of the debt it sought because its representatives admitted

over the phone and in writing to Plaintiffs that it was collecting charges associated with a loan that had been fully discharged in their 2007 refinance. Yet even after acknowledging this error to Plaintiffs, it continued to collect the unauthorized fees. Thus, as alleged, even if the collection of those fees had initially been an error, when Household Finance continued to collect the debt it did so knowing that it lacked the right to do so.

Household Finance's argument that Plaintiffs' MCDCA claims are barred by a three-year statute of limitations fails. Maryland law requires "a civil action at law [to be] filed within three years from the date it accrues unless another provision of the Code provides a different time period within which an action shall be commended." Md. Code Ann., Cts. & Jud. Proc. § 5-101. In Maryland, the "discovery rule" is applied "generally in all civil actions." *Hecht v. Resolution Tr. Corp.*, 333 Md. 324, 333 (1994). The discovery rule provides that "a cause of action 'accrues' when plaintiff knew or should have known that actionable harm has been done to him." *Doe v. Maskell*, 342 Md. 684, 690 (1996). As alleged, Plaintiffs did not learn that Household Finance violated the MCDCA until December 2015 when they discovered through discussions with Caliber's representatives that Household Finance had continued to divert their payments towards unauthorized charges despite its May 2015 admission to this error. ECF No. 1-2 ¶¶ 32–33. Thus, Plaintiffs' cause of action accrued in December 2015, less than three years before Plaintiffs filed suit in October 2018.

### ii. Defendant Caliber

Plaintiffs have also sufficiently pled MCDCA claims against Caliber. Plaintiffs allege that after the servicing transfer to Caliber, they continued to make timely payments on their loan. *Id.* ¶ 35. However, they noticed that Caliber was applying portions of their payments to purported uncollected late charges. *Id.* Mrs. Gillis thus contacted Caliber on April 7, 2016 and

spoke with an authorized representative to (i) learn why Caliber was assessing for a fee its predecessor had admitted it had no right to collect; and (ii) to obtain a payment history. *Id.* ¶ 36. Caliber's representative could not answer why Caliber was charging Plaintiffs these fees except that the representative suggested that the fees were associated with a purported 2010 loan modification. *Id.* But Plaintiffs loan had not been modified in 2010, and, as alleged, Caliber did not have any paperwork on file to the contrary. After Mrs. Gillis's phone call with Caliber's representative, Caliber knew or should have known that it was not authorized to collect charges that Household Finance had admitted were previously being assessed in error. Yet it continued to divert portions of Plaintiffs' payments towards those charges.

Caliber's position that Plaintiffs have failed to state their MCDCA claims with particularity is unavailing. The Fourth Circuit has not concluded that Rule 9(b)'s heightened pleading standard applies to MCDCA claims, and this Court declines to find that standard applicable here. *See Conteh*, 648 Fed. Appx. at 381. Statutory consumer protection claims, like claims under the MCDCA and portions of the MCPA based on non-fraudulent but unfair or deceptive conduct, are not required to be pled with particularity. *See Proctor v. Metropolitan Money Store Corp.,* 645 F. Supp. 2d 464, 476 (D. Md. 2009); *see also McCormick v. Medtronic, Inc.*, 219 Md. App. 485, 529–30 (2014). Further, even to the extent that MCDCA claims sound in fraud because a plaintiff must prove the defendant acted knowingly, under Rule 9(b)'s heightened standard, "knowledge[] and other condition[s] of mind of a person may be averred generally." *Beuster v. Equifax Information Services*, 435 F. Supp. 2d 471, 480 (D. Md. 2006) (citing Fed. R. Civ. P. 9(b)). In sum, Plaintiffs have sufficiently alleged their MCDCA claims against Defendant Caliber.

### iii. Defendant SPS

Plaintiffs have also sufficiently pled MCDCA allegations against Defendant SPS. Specifically, Plaintiffs allege that SPS knowingly sought to collect sums owed on their previously satisfied loan, sums paid by Plaintiffs for taxes and insurance but claimed due by SPS for escrow, and purported deferred principal, which Plaintiffs never agreed to pay. ECF No. 1-2 ¶¶ 58, 64, 66, 71–73. Even if SPS had at first received misinformation about the fees associated with Plaintiffs' previously discharged loan from Caliber and HFC, it learned that these fees were unauthorized and that Plaintiffs pre-2007 loan had been fully paid through a refinance when Plaintiffs communicated this information to its representatives. It also learned through these communications that Plaintiffs were up to date on their taxes and insurance and that Plaintiffs had not agreed to escrow funds with SPS. *Id.* ¶¶ 48, 50–54, 57. The Complaint shows that SPS clearly knew that Plaintiffs had not agreed to an escrow account because on June 21, 2017, SPS sent Plaintiffs a notice requesting that Plaintiffs sign and return a document to establish an escrow account going forward. *Id.* ¶ 57. Yet SPS continued to report a negative escrow balance as part of Plaintiffs' payoff statement, thus attempting to collect a debt that it knew it did not have the right to collect. *Id.* ¶ 58.

Because Plaintiffs have sufficiently alleged MCDCA claims against Defendants Household Finance, Caliber, and SPS, Defendants' motions to dismiss Count I will be denied.

### B. Maryland Consumer Protection Act (MCPA)

Defendants also move to dismiss the MCPA claims Plaintiffs allege in Count II. "To state a claim under the MCPA, a plaintiff must adequately plead that: (1) the defendant engaged in an unfair or deceptive practice or misrepresentation, (2) the plaintiff relied upon the misrepresentation, and (3) doing so caused the plaintiff actual injury." *Barr v. Flagstar Bank,*

*FSB*, 303 F. Supp. 3d 400, 416 (D. Md. 2018). An unfair, abusive, or deceptive trade practice is defined as a "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," or a "[f]ailure to state a material fact if the failure deceives or tends to deceive." Md. Code, Com. Law §§ 13-301(1), (3). While some provisions of the MCPA sound in fraud and are subject to Rule 9(b)'s heightened pleading standard, *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013), the provisions barring unfair and deceptive practices need not be alleged with particularity, *McCormick v. Medtronic, Inc.*, 219 Md. App. at 529–30. *See also Luskin's, Inc. v. Consumer Prot. Div.*, 353 Md. 335, 366–367 (1999).

Here, by alleging the MCDCA claims discussed above, Plaintiffs have also alleged that Defendants engaged in an unfair or deceptive practice or misrepresentation. Further, Plaintiffs relied on Defendants' misrepresentations by continuing to make payments even though their payments were being partially diverted towards unauthorized charges. ECF No. 1-2 ¶¶ 31–33, 36, 41, 43, 47, 50, 53–55, 62, 63, 70. Because of Defendants unfair and deceptive practices, portions of Plaintiffs' payments were diverted to unauthorized fees, *id.*, and Plaintiffs sustained losses including postage expenses and lost time from work, *id.* ¶ 76. Plaintiffs also experienced sleeplessness and exacerbated medial conditions including headaches and high blood pressure because of their years-long battle to have inaccurate information removed from their loan account and to stop making payments on debt that they did not owe. *Id.*

Defendants Household Finance and Caliber argue that Plaintiffs' MCPA claims must fail because Plaintiffs knew that any inaccurate statements made by Defendants were false and therefore cannot show that they reasonably relied on Defendants' unfair and deceptive practices.

19

ECF No. 15-1 at 8, 17; ECF No. 16-1 at 7, 19. This argument fails. The facts alleged show that Plaintiffs were primarily, and reasonably, concerned with making timely payments on their loan to avoid defaulting on the mortgage. ECF No. 1-2 ¶ 32. Therefore, even as Plaintiffs battled with Defendants over inaccuracies, they felt compelled to continue to make payments, relying on their reasonable belief that a licensed mortgage lender would not violate the law.

Taken together, Plaintiffs' MCPA claims will survive Defendants' motions to dismiss.

### C. Maryland Mortgage Fraud Protection Act (MMFPA)

In Count III, Plaintiffs allege that Defendants violated the MMFPA. Defendants move to dismiss these claims. The MMFPA prohibits the commission of "mortgage fraud," Md. Code Ann., R.P. § 7–402, which is defined as:

> [A]ny action by a person made with the intent to defraud that involves:
>
> (1) Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process . . .

*Id.* § 7–402(d). The "mortgage lending process" includes servicing. *Id.* § 7–401(e)(1)–(2)(i). Claims brought pursuant to the MMFPA sound in fraud, meaning plaintiffs must allege the claims with the particularity required by Rule 9(b)'s heightened pleading standard. *Galante v. Ocwen Loan Servicing LLC*, No. CIV.A. ELH-13-1939, 2014 WL 3616354, at *28 (D. Md. July 18, 2014).

Although Plaintiffs have alleged that each Defendant knowingly made misrepresentations or omissions about the subject loan, they have failed to allege particular facts showing that Defendants intended to defraud Plaintiffs. Therefore, Plaintiffs' MMFPA claims must be dismissed.

### D. Real Estate Settlement Procedures Act (RESPA)

Plaintiffs allege in Count V that Defendants Caliber and SPS violated RESPA by failing to provide notice of receipt of Plaintiffs' qualified written requests (QWRs) and failing to reasonably investigate their inquiries within 30 days. To state a claim under RESPA's QWR provisions, a plaintiff must allege: "(1) a written request that meets RESPA's definition of a QWR, (2) the servicer failed to perform its duties, and (3) actual damages." *Barr v. Flagstar Bank, FSB*, 303 F. Supp. 3d 400, 417 (D. Md. 2018). RESPA defines a QWR as written correspondence "that (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B).

12 U.S.C. § 2605(e) provides a duty to respond to QWRs:

> If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.

12 U.S.C. § 2605(e)(1)(A). The statute also requires servicers to make appropriate corrections to a borrower's account as needed or to conduct a reasonable investigation and provide the borrower with a written explanation or clarification of the servicer's decision. *See* 12 U.S.C. § 2605(e)(2); C.F.R. §§ 1024.35(e)(1)(i)(B), 1024.35(e)(1)(ii), 1024.35(e)(2)(ii) (describing that a servicer must conduct a reasonable investigation when responding to notice of errors).

Plaintiffs sent several QWRs to Defendant SPS. ECF No. 1-2 ¶¶ 55, 62, 70. Plaintiffs sent these requests for information because the account reflected a negative escrow balance even

though Plaintiffs had never agreed to an escrow account; the account reflected inaccurate issues with property tax and insurance payments that Plaintiffs believed were up to date; and SPS had communicated inaccurately that Plaintiffs' loan had been modified in 2010. *Id.* Rather than conducting a reasonable investigation into Plaintiffs' inquiries, SPS simply continued to report inaccurate account information to Plaintiffs. *See e.g.*, *id.* ¶¶ 58–60, 66–67, 71. For example, in response to Plaintiffs' notification that they were up to date on taxes and insurance and request that SPS update related inaccurate information on their account, SPS responded by defending the taxes and insurance information as valid. *Id.* ¶ 58. Yet, as alleged in the Complaint, a reasonable investigation would have demonstrated that Plaintiffs' property taxes and insurance payments were current. *Id.* ¶ 59. Similarly, SPS continued to report that Plaintiffs owed purported escrow costs, but a reasonable investigation would have revealed that Plaintiffs had never agreed to escrow funds with SPS. *Id.* ¶ 58, 60. In this context, it is reasonable to infer that SPS failed to investigate Plaintiffs' QWRs, and Plaintiffs have stated a RESPA claim against SPS.

Plaintiffs also sent Defendant Caliber a QWR requesting (i) all documents relating to any loss mitigation application or decision on those applications; (ii) all mortgage statements made by Caliber; (iii) copies of all payments made on Plaintiffs' account; (iv) copies of all audio recordings made related to Plaintiffs' loan; (v) all documents sent to SPS regarding the status of Plaintiffs' loan when it was transferred; (vi) all documentation related to any property tax purportedly paid by Caliber to the Prince George's County Treasurer related to the property; and (vii) an accounting of all purported expenditures made by Caliber from escrow. *Id.* ¶ 63. Caliber provided only a partial response. *Id.* ¶ 64. It did not respond with any documentation related to property taxes purportedly paid by Caliber on Plaintiffs' behalf, explaining that it had "determined any unanswered questions to be overbroad and/or unduly burdensome." *Id.*

To be sure, a servicer need not respond to a QWR if it "is overbroad or unduly burdensome." 12 C.F.R. § 1024.36(f)(1)(iv). "An information request is overbroad if a borrower requests that the servicer provide an unreasonable volume of documents or information to a borrower." *Id.* However, Plaintiffs' request for information related to any tax payments made by Caliber on their behalf did not require Caliber to provide an unreasonable volume of documents or information, particularly because Plaintiffs believed that Caliber had not paid any taxes on their behalf. By alleging that Plaintiffs requested in writing information related to any tax payments purportedly paid by Caliber from Caliber and that Caliber failed to respond to this request, Plaintiffs have sufficiently stated a RESPA claim against Caliber.

In sum, Defendants' SPS and Caliber's motions to dismiss Plaintiffs' RESPA claims will be denied.

### E. Com. Law § 12-114(a)

In Count IV, Plaintiffs allege that Defendant SPS violated Maryland usury law. Commercial Law § 12-114(a)(1)(ii) provides that:

> (1) Any person who violates the usury provisions of this subtitle shall forfeit to the borrower the greater of:
> (i) Three times the amount of interest and charges collected in excess of the interest and charges authorized by this subtitle; or
> (ii) The sum of $500.

*Id.* One such usury provision, Com. Law § 12-105(d), provides that "[i]n connection with a mortgage loan, a lender may not require or authorize the imposition of a penalty, fee, premium, or other charge in the event the mortgage loan is prepaid in whole or in part." § 12-105(d). "'Lender' means a licensee or a person who makes a loan." § 12-101(f). Although Plaintiffs have alleged that SPS charged them EZ-pay fees on numerous occasions, thus imposing a penalty for prepayments of their monthly bill, ECF No. 1-2 ¶¶ 67, 75, Plaintiffs have not alleged that SPS

qualifies as a "lender" under Com. Law § 12-105. *See* § 12-101(f); *see also Kemp v. Seterus*, No. 441428-V, 2018 Md. Cir. Ct. LEXIS 9, at *9 (Montgomery Cnty. Cir. Ct. Oct. 19, 2019) ("no case has been cited to the court imposing liability on a person or legal entity other than the one which provided the loan proceeds directly to the borrower.").

As such, Plaintiffs have failed to state a claim under Maryland's usury laws and SPS's motion to dismiss Count IV will be granted.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted and part and denied in part. A separate Order shall issue.

Date: <u>July 29, 2019</u>                        <u>        /s/                              </u>
                                                                    GEORGE J. HAZEL
                                                                    United States District Judge